In re Efraim **ABRAMOFF** and Orah Abramoff, Debtors.

Efraim **ABRAMOFF** and Orah Abramoff, Plaintiffs,

v.

**LIFE INSURANCE COMPANY OF GEORGIA, Defendant.**

Bankruptcy No. 5–86–00173–A–11. Adv. No. 87–5290–A.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Sept. 30, 1988.

Patrick H. Autry, Matthews & Branscomb, San Antonio, Tex., for debtors/plaintiffs.

Ronald B. King, William B. Kingman, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, Tex., for defendant.

R. GLEN AYERS, Jr., Chief Judge.

I.

FACTS [1]

On November 22, 1982, Efraim Abramoff borrowed the sum of $2,970,000.00 as the permanent financing of an office building

known at the time as Horizon Point Office Building. The loan called for an annual interest rate of 14 percent and a term of 30 years. The lender was Life Insurance Company of Georgia, which arranged the loan through its servicing agent, Mortgage and Trust, Inc.

The loan documents absolutely barred prepayment during the first 10 years of the loan. If the loan was accelerated, however, the borrower was required to pay a penalty of 10 percent of the then-outstanding principal and interest. At the end of 10 years, prepayment was allowed but a penalty was assessed for early termination. Initially, the penalty would be 10 percent, but would decline at the rate of 1 percent per year.

The loan documents also prohibited the sale or transfer of ownership of Horizon Point without the express consent of the lender (a "due on sale clause").

The loan documents contained the following provisions which are the subject of this litigation:

(a) A prepayment penalty and an absolute prohibition against early termination for a period of 10 years;

(b) A due-on-sale provision at lender's election; and

(c) A penalty to be assessed in the event of acceleration in an amount of 10 percent during the first 10 years and an amount equal to the applicable prepayment penalty thereafter.

A pause here is appropriate. Look again at the prepayment penalty structure. The debtor had no right to prepay during the first ten years. Only the lender could initiate a prepayment requirement during that period by accelerating the debt. So, upon default, during the first ten years, the debtor would be required to pay the outstanding principal, interest, fees, and so forth plus 10 percent of the principal and interest due.

Naturally, after agreeing to all of this, Abramoff placed the building into inventory and began marketing the property.

1. The facts were (largely) stipulated and the entire trial took perhaps one hour.

Doubtless, he expected to sell "subject to" with a consent to the sale and assumption of the debt. This was not to be, for the market had turned and this property, like Abramoff's other property, began to decline in value as the San Antonio market collapse had become apparent to everyone.

Now, Abramoff really needed to sell. The cash flow crunch occasioned by Abramoff's other investments began to affect the ability of Abramoff to make payments on all debt in 1985. It appears that the loan, while occasionally in a late-payment status, fell into "final" default in April 1985 and never surfaced again. During the summer of 1985, associates of Abramoff contacted the lender and the servicing agent regarding the possibility of either early prepayment of the loan, a possible assumption of the loan, or sale of the premises. By August 1985, the requests for "opening" the loan for either prepayment, assumption, or sale became more fervent and frantic.

The documents produced during the course of this litigation demonstrate that Life of Georgia, through its servicing agent, indicated an intent to accelerate the debt on several occasions. Although the specific acceleration document has not been found by the parties, Life of Georgia has admitted that the maturity of the loan was accelerated in August, 1985, in reaction to Abramoff's default in payment. Initially, Life of Georgia indicated that it would proceed to "installment" foreclosure on the debt in August 1985. There is no dispute that the full debt was accelerated during August 1985, and the property posted for foreclosure for a sale to occur on October 1, 1985.

From a period of time beginning in approximately March 1985, Mr. Abramoff had been negotiating the sale of Horizon Point to Solomon Abdo. The property was under contract to Mr. Abdo at the time that it was posted for foreclosure. Ultimately, Abramoff sold Horizon Point to Abdo for a cash price of $4,000,000.00, although the initial contract had contained a sales price of $5,250,000.00. The sale occurred on the "eve of foreclosure" and in the face of a

termination by the lender of Mr. Abramoff's interest in the property.

The lender accelerated the loan to Abramoff not as a consequence of the sale of the property to Abdo, but as a unilateral election of its option to do so in response to payment default. The terms of the loan documents do not call for a prepayment penalty where the lender has consented to transfer. The record reflects that numerous letters in August and September 1985 virtually plead for the option to prepay the loan and to allow Mr. Abramoff to sell Horizon Point without having to suffer the prepayment penalty. Similarly, the letters plead for the lender to give Abramoff a "payoff" figure for use in connection with the pending sale. Rather than consent to the sale, Life of Georgia did not respond to the inquiries except to say that the loan was "closed" to prepayment and that Life of Georgia preferred an assumption rather than a payoff. Eventually, and truly "eventually", Life of Georgia did provide, through Mortgage and Trust, Inc., a payoff amount.

On September 27, 1985, Abramoff sold Horizon Point to Abdo. Although there is some dispute regarding the applicable closing statement, it is not controverted that Life of Georgia received the sum of approximately $3,470,000.00 at the closing of the sale which amount included the sum of $295,221.65 attributable to the so-called "prepayment penalty". Life of Georgia has admitted that it received all regular interest due on the principal amount of its debt. Abramoff tendered the "prepayment" sum under protest to the title company and the sale closed.

## II.

Abramoff filed this action seeking to recover the prepayment charge and any applicable penalties under two basic theories: (1) that the prepayment charge assessed by Life of Georgia constituted usury requiring the penalties prescribed by Texas statutes; and (2) that the charge assessed constituted a "fraudulent transfer" recoverable under Sections 548 and 550 of the Bankruptcy Code. The "fraudulent transfer" argu-

ment is based upon an argument that a prepayment charge coupled with a "due on sale clause" creates a situation that can only be characterized as an "unreasonable" and void restraint on alienation. Therefore, Abramoff argues, Scylla and Charybdis can be avoided on public policy grounds and the payment recovered under §§ 548 and 550.

This Court has previously recommended that Life of Georgia's motion for abstention be denied. The District Court has not yet ruled on the recommendation issued by this Court.

The parties, by agreement, and with the indulgence of the court, are withholding two matters from consideration at this time. These are (1) the calculation of the annual rate of interest represented by the prepayment charge and (2) the issue of the insolvency of Abramoff at the time of the transfer. Both matters call for the expenditure of compensation for testimony which Life of Georgia has courteously agreed need not be incurred unless and until the court rules in favor of Abramoff on the critical legal issues.

## III.

### ISSUES OF LAW

The following issues of law must be decided by this court:

1. Do the provisions of the loan documents, notably the prepayment prohibition and penalty, acting in tandem with the due-on-sale and other provisions, constitute an unreasonable restraint on alienation of Horizon Point which the courts of Texas would not condone?

2. Did the charge assessed by the defendant upon the sale of Horizon Point ("prepayment charge") constitute interest as contemplated by the Texas usury statutes? And, if interest, what is the period of time over which the interest calculation is to be made, i.e. what is the applicable spread period?

2. This is purely an issue for state law. *See Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59

3. Did the receipt by Life of Georgia of a charge in the amount of $295,221.65 as compensation for early termination of the loan upon lender's acceleration constitute a fraudulent transfer under Section 548 of the Bankruptcy Code? That is, was there a transfer of "reasonably equivalent value"?

## IV.

### DISCUSSION

A. THE TERMS OF THE LOAN DOCUMENTS CONSTITUTE AN "UNREASONABLE RESTRAINT UPON ALIENATION" OF ABRAMOFF'S INTEREST IN HORIZON POINT.

While the parties are generally free to write any provision into a contract, certain provisions in real estate contracts are believed to be barred by a greater interest, the free alienability (or transferability) of real property. Courts have found certain restraints offensive, or "unreasonable", and have refused to enforce those contracts.[2]

The Horizon Point contract barred prepayment for a period of 10 years. In the event of early termination through acceleration during the 10 year period, the borrower was to be assessed a "charge" equaling 10 percent of the then-outstanding principal and interest. After 10 years the penalty would decline annually by 1 percent.

The Horizon Point loan also provides that there is to be no conveyance of the property without the express consent of the lender. In the event that the lender consents to a transfer (and presumptively, an assumption of the loan), the lender in this case is free to charge a different rate of interest for the continuation of the loan, and to make such other alterations and modifications of the loan as it sees fit.

The Horizon Point loan also provides that in the event that the property is sold or transferred without the lender's consent, the lender may elect to treat the entire loan as due and payable.

L.Ed.2d 136 (1979).

There is really no controversy concerning the fact that the lender is discouraging early termination and payoff of the loan. Correspondence between the borrower and the servicing agent clearly indicates that the lender did not desire early termination of the loan, but would definitely rather have had an assumption of the existing loan (with modifications, one assumes, as necessary).

It is clear that Abramoff was not able to simply sell Horizon Point and obtain the release of Life of Georgia of its liens and security interests through payment of the then-outstanding principal and interest. Were that the case, there would be no litigation for the Court to consider. The loan documents clearly "restrained" Abramoff's ability to deal with this property.

The lead case in Texas regarding the relationship between similar provisions and the concept of restraint upon alienation is *Sonny Arnold, Inc. v. Sentry Savings Ass'n.*, 633 S.W.2d 811 (Tex.1982). The court adopted and acknowledged that, under the *Restatement of Property*, Section 404 (1944), there are essentially three types of restraints upon alienation:

(a) the disabling restraint, which renders the conveyance void;

(b) the promissory restraint, which imposes liability upon the transferor for an unauthorized transfer; and

(c) the forfeiture restraint, which terminates or subjects to termination the interest transferred.

The *Sonny Arnold* court held that a due-on-sale provision alone did not constitute a restraint upon alienation because the acceleration provision did not impose additional liability upon the transferor. *Sonny Arnold, Inc. v. Sentry Savings Ass'n*, 633 S.W.2d at 814–15. Therefore, the court never reached the issue of whether the restraint was either "reasonable" or "unreasonable". However, the court did note that the due-on-sale clause, since it constituted an acceleration provision, was still subject to the "equitable rules and defenses applicable to other acceleration provisions." *Id.* at 815, citing *Parker v. Mazur,*

13 S.W.2d 174 (Tex.Civ.App.—San Antonio 1928, *writ dism'd*).

In a stinging concurrence, Justice Spears criticized the majority for a too-rigid interpretation of the term "restraint". Interestingly enough, the very example cited by Justice Spears as presenting a compelling case for a determination of "reasonable restraint" mirrors the facts presented by the Abramoff case:

> Moreover, in examining a clause to determine whether it restrains alienation, we must look to the contract as a whole and not solely to the due-on-sale clause. The restraining effect of the clause may be even more pronounced if the contract also contains a prepayment penalty. Where both a due-on-sale clause and a prepayment penalty are present, the homeowner is forced to pay a penalty for conveying his property even if his buyer obtains new financing and retires original debt.

633 S.W.2d at 818 (Spears, concurring). In sum, Justice Spears would have taken a broader approach to the analysis of whether a restraint exists and would adhere to the spirit of the Restatement rather than the strict wording.

The combination of the various clauses in the Abramoff loan documents clearly fits within the Restatement definition of restraint. Initially, the loan is absolutely closed to prepayment for 10 years. Further, the presence of a prepayment penalty imposes a promissory restraint upon the transferor. Also the lender, absent consent to the transfer, has the ability to accelerate the full debt under the loan.

■ All of this reasoning is unnecessary, however, except in support of the controlling case: *Metropolitan Savings & Loan Association v. Nabours*, 652 S.W.2d 820 (Tex.Civ.App.—Tyler 1983). *Nabours* clearly holds that the presence of a due-on-sale provision in tandem with a prepayment penalty raises a sufficient quantum of evidence to support a finding that the lender had created an "unreasonable restraint upon alienation." 652 S.W.2d at 823. The court, in reviewing the loan provisions in

question, discussed at length the effects of the combined provisions:

> The restraint under consideration, found in the provisions of the mortgage, is effective only during the existence of the mortgage debt and was created by an unambiguous clause prohibiting transfer without the consent of the mortgagee. The restraint here compels the transferee of the mortgage to re-negotiate a loan with the mortgagee. In such renegotiations, there are no limits, and as a price for its consent, the mortgagee would be free to raise the interest rate and shorten the time for re-payment of the principal owed at the time of the transfer, thereby drastically increasing the amount of monthly payments required. The mortgagee is also free under this restraint to rewrite any of the provisions of the deed of trust securing the payment of the mortgage note secured thereby. If the mortgagor fails to secure the approval and consent of the mortgagee to the transfer to his proposed transferee, he undoubtedly will suffer acceleration of the debt and foreclosure of the lien against his property. Under this record, the mortgagor would also be liable for the prepayment penalty as set forth above. All of these possibilities would be well known to both the mortgagor and his proposed transferee.

652 S.W.2d at 823.

Having determined that the combined provisions constituted a restraint within the confines of existing Texas case law, the *Nabours* court continued with a discussion of the "reasonableness" of the restraint. A major factor in the court's mind was the essentially unfettered ability of the lender to renegotiate the terms of the debt: "As pointed out above, the requirements that Metropolitan consent to the transfer meant

that it was free to renegotiate the terms of the deed of trust and other ancillary documents without limitation." 652 S.W.2d at 823.[3]

Under the *Butner* doctrine, this court considers itself bound by *Nabours*, with which it also agrees, and must rule that *Nabours* controls. The Texas courts—or the only Texas court to consider the matter directly—would refuse to enforce this contract and this court is bound to follow that lead.

This penalty, or charge calculated at the same rate as the prepayment penalty, was applicable upon acceleration either by virtue of the due-on-sale clause or acceleration due to borrower's default in payment. Under the case law, the various provisions of the loan documents constituted not only a restraint upon alienation, but also an unreasonable restraint upon alienation.

## B. ABRAMOFF DID NOT RECEIVE "REASONABLY EQUIVALENT VALUE," AS DEFINED UNDER SECTION 548 OF THE BANKRUPTCY CODE, IN RETURN FOR THE CHARGE ASSESSED BY LIFE OF GEORGIA.

Section 548(d)(2) defines value as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." The statute does not provide a definition of "reasonably equivalent value" and that phrase has been left to a case-by-case determination. The analysis is two-fold. A determination of whether a transferee Life of Georgia has given a "reasonably equivalent value" to the transferor requires two distinct determinations:

> The district court correctly noted that no prepayment penalty is imposed if payment before maturity occurs as a result of acceleration under the due-on-sale clause or any other clause. Thus, the plaintiffs were not forced to suffer any penalty if the defendant accelerated the loan because of an unapproved sale. 706 F.2d at 561.

---

**3.** The Fifth Circuit has also acknowledged the social dangers inherent to the dual operation of a due-on-sale clause and a prepayment penalty. *Casey v. Business Men's Assurance Company of America,* 706 F.2d 559 (5th Cir.1983). While holding in that case that a due-on-sale clause did not constitute a restraint upon alienation (following *Sonny Arnold,* explicitly), the court of appeals illustrated the weak link in the plaintiff's argument as follows:

(a) Did the transferee give any value at all?

(b) Was the value given a reasonably equivalent value to the value of the property transferred?

*In re Universal Clearing House Co.*, 60 B.R. 985, 998 (D.Utah 1986).

The charge assessed by Life of Georgia does not constitute reasonably equivalent value because payment in satisfaction of an "unreasonable restraint against alienation" does not constitute value at all because the restraint is voidable as a matter of law.

In the instant case, Life of Georgia admittedly received all principal and accrued interest from inception of the loan to payoff. Life of Georgia also received a bonus of nearly $300,000.00. Because the right to the charge is not enforceable, the satisfaction of the contractural claim does not constitute value or reasonably equivalent value. *See In re Independent Clearing House Company*, 77 B.R. 843, 858 (D.Utah 1987) [payment in satisfaction of a contract contrary to public policy does not constitute "value"].

The critical analysis is not what Life of Georgia gave up, but what Abramoff received. The facts and circumstances of this case require that Abramoff have judgment against Life of Georgia for recovery of the payment.

C. UNDER THE FACTS OF THIS CASE, THE CHARGE ASSESSED BY LIFE OF GEORGIA CONSTITUTES INTEREST.

■ Interest, as defined by the statute, is "the compensation allowed by law for the use or forebearance or detention of money...." TEX.REV.CIV.STAT.ANN. art. 5069–1.01 (Vernon 1987). Courts have reasoned that a charge for prepayment of the loan is consideration for the privilege or early termination of an indebtedness which would otherwise continue. *See Bearden v. Tarrant Savings Association*, 643 S.W.2d 247 (Tex.App.—Ft. Worth 1982, writ ref'd n.r.e.).

The only distinction which exists between interest which accrues normally on an indebtedness and a prepayment charge is the unilateral right on the part of the lender to make demand for the payment. Both serve the obvious purpose of providing the lender with a rate of return on the lender's investment. The point is well illustrated in the deposition taken of Maurice Moore, a representative of Life of Georgia's sister corporation (The Investment Centre) and the individual responsible for the loan at the time the charge was assessed. Mr. Moore explained the purpose of the charge as follows:

> We put a what we call make whole provision that the prepayment premium, in the event of a default, is an amount to be calculated that would earn us the same interest had the loan remained in place if we were to then take those funds at that point in time and we invest them in an alternative investment at that point in time when it was paid off early.

Deposition of Moore, p. 50, lines 4–10. The deponent provided additional insight to the function of the provision in response to the following question:

Q. With respect to the previous paragraph that you had read, why, almost as a policy matter, would the note require prepayment penalty in the event of acceleration by the lender?

A. Thus—this loan at the time that it was made is what I refer to as a participating loan. Interest rates at that time were much higher than the stated rate on this note of 14 percent. We reduced the rate considerably for Mr. Abramoff and in return took a long-term perspective in view of this property in which we agreed to participate in future income generated by this property. He received the benefit of a substantially lower interest rate and we were to receive a portion of future rental increases generated by that property if there were any. The only way we could receive our return back under this type of investment was to hold it for a longer period of time. Therefore, we structured provisions in the prepayment of that loan such

that we would be assured that we could hold and be involved in that loan over a period of time that would allow us some benefit for having reduced the interest rate in the initial early years.

Deposition of Moore, pp. 52–53, lines 23–25, 1–18.

It is clear from the deposition testimony of Mr. Moore that the function of the assessment was to compensate the lender for an initially "reduced" interest rate. Clearly the assessment is in "lieu of interest" and serves as an investment-return item for the lender.

Nevertheless, in Texas, a true prepayment penalty is not interest. Rather, prepayment penalties are considered to be contractual provisions whereby the debtor can avoid large interest payments in the future. *See Bearden v. Tarrant Savings Ass'n.*, 643 S.W.2d 247 (Tex.App. Ft. Worth 1982, writ ref'd n.r.e.). In this case, the payment is not either a prepayment penalty or a non-interest "buy-out" feature. First, the payment was not voluntarily made by the borrower in order to pay off the loan, but was made in response to a unilateral right held by the lender. The real key here is in the simple fact that this was not a prepayment penalty but an acceleration penalty allowing the lender to collect an additional ten percent.

The Commission of Appeals, in perhaps the earliest of the Texas prepayment penalty cases noted that:

> In order to constitute such a contract usurious [that being a contract with a prepayment penalty], the lender must be entitled to demand prepayment of the money loaned [citations omitted]. The provision in the contract for the prepayment privilege is not a contract for the forebearance of an existing indebtedness or a loan of money....

> The lender in this case had no right to require payment of three months' advance interest. This was purely optional with the borrower. *There being no right to demand payment, there was no forebearance, and with forebearance, no usury.*

*Vela, et al v. Shacklett*, 12 S.W.2d 1007, 1008 (Tex.Comm'n.App.1929, judgm't adopted) (emphasis added).

The penalty imposed by Life of Georgia in this case constitutes interest for it is an added penalty imposed of acceleration. The charge here is not for prepayment but is suffered because of a default.

### D. THE COURT ELECTS TO "SPREAD" THE CHARGE OVER THE PERIOD OF TIME BETWEEN INCEPTION AND PAYOFF.

Texas usury statutes provide certain safe-harbor provisions regarding spreading of interest and rebating of overcharges in the event of early termination of a loan secured by a lien against real estate. TEX. REV.CIV.STAT. art. 5069–1.07(a) (Vernon 1987). The statutory spreading provision addresses the usurious interest which a lender may inadvertently receive through borrower's prepayment of a debt, but does not apply where the lender has acted on its own. The Court of Appeals, Dallas, has interpreted the provision as follows:

> The statute implies that the "refund or credit" provision applies only to interest that would otherwise be usurious solely as a result of the borrower's prepayment. The provision was designed to permit lenders to avoid the penalties only when they inadvertently have received usurious interest as a result of the borrower's action in prepaying an otherwise non-usurious loan. It is inconceivable that the legislature intended that the "refund or credit" provision be used by lender as a bootstrap to escape the statutory penalties whenever their own unilateral actions cause them to receive usurious interest.

*Coppedge v. Colonial Savings & Loan Association*, 721 S.W.2d 933 (Tex.App.—Dallas 1986).

A similar line of reasoning prevails over any argument that the 10% charge assessed by the lender in this case must be amortized or spread over the time during which the loan was in existence or over the full term (thirty years) of the loan originally contracted for.

By virtue of acceleration, Life of Georgia created a new obligation which was not at all the original thirty year loan to which the parties agreed in November 22, 1982. It was something quite different. By virtue of acceleration, the full principal amount of the obligation became immediately due and payable. The "stated term of the loan" thus became, effectively, a demand obligation which was due immediately. The lender, not the borrower, changed the nature of the obligation in this case.

Detention is defined by the case law as arising "when a debt has become due and the debtor has withheld payment without a new contract giving him the right." *Tygrett v. University Gardens Homeowners' Assn.*, 687 S.W.2d 481 (Tex.App.—Dallas 1985), citing *Parks v. Lubbock*, 92 Tex. 635, 51 S.W. 322 (1899).

Abramoff does not seek to deny Life of Georgia the refuge of spreading interest, but insists that the interest must be spread over an appropriate period. A common law approach is required in this case, and the common law suggests that the interest must be based on:

> ... the entire term during which the borrower had the use, detention or forebearance of the principal debt.

*Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 786 (Tex.1977); *see also Nevels v. Harris*, 129 Tex. 190, 102 S.W.2d 1046 (1937). The appropriate period of time for the spreading of interest in this case is for the period from the inception of the principal obligation until the obligation was paid. The appropriate period begins November 22, 1982 and ends September 30, 1985.

Life of Georgia received not only all interest on its principal at the rate of 14% through to the date of payoff, but also received nearly $300,000.00 for the penalty. The rate of interest is to be calculated by treating the 10% charge and the contract interest and extrapolating that amount to an annual effective rate of interest.